JOHN DELYRA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Delyra v. Commissioner
Docket No. 7311-71.
United States Tax Court
T.C. Memo 1974-151; 1974 Tax Ct. Memo LEXIS 167; 33 T.C.M. (CCH) 660; T.C.M. (RIA) 74151; June 12, 1974, Filed. John Delvra, pro se. Harvey Poe, for res pondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent determined the following deficiency in and additions to petitioner's 1965 Federal income taxes: Deficiency
Additions to Tax $36,932.40
Section 6651(a): $9,233.10
Section 6653(a): l,846.62
Section 6654: 1,034.14
The only issue for our decision is whether, and to what extent, receipts of a fraudulent enterprise in which petitioner participated in 1965 must be included in his income. FINDINGS OF FACT Some of the facts have been stipulated and are *168 so found. John Delyra (petitioner) was a resident of the Federal Prison Camp, Allenwood, Pennsylvania, at the time he filed the petition herein. He did not file a Federal income tax return for the 1965 taxable year. In early November of 1964, petitioner, Roy Berg (Berg) and Jack Arnold (Arnold) organized Colombia Resources Ltd. (Colombia). A checking account was opened for Colombia at the Chase Manhattan Bank in New York, with the company's mailing address being listed as 80 Wall Street in New York, the same address at which petitioner had his own office. On the signature card relating to such account, Berg was listed as the company president, Arnold as treasurer. Jack Kramer, which was the name Anthony Delyra (Anthony), petitioner's brother, went by in a number of the transactions to be described below, was listed as the company vice-president. While it was thought by petitioner in late 1964 that Colombia might engage in a certain real estate venture, such proved unfeasible, and the company was involved in no business activities until late in 1965. Its opening balance of $1,000 the Chase gradually decreased, until, in June 1965, the company had no funds in the account. *169 The company owned no other assets, and the record does not establish that it ever filed any type of Federal or state income tax return. Sometime in the summer of 1965, Frank Crisona, an attorney, and John Neiman (Neiman) approached petitioner and asked whether they might utilize Colombia for purposes of a certain mortgage commitment venture they were planning. Under their plan, Colombia would give mortgage commitments to individuals and corporations who were in need of financing for different types of real estate projects. Colombia would require an advance fee of one or two percent of the face amount of the desired mortgage from the client, and would then promise to deliver a mortgage at some future specified date. Petitioner was immediately interested in the plan and agreed to allow Colombia to act as the vehicle through which the plan would be carried out. Other persons who discussed the plan at this time, and participated later in its operations, included Anthony, Morris Graber, and Frank Parks (collectively, together with petitioner, Neiman and Crisona, to be hereinafter referred to as the group). Berg and Arnold were not involved. In addition to allowing the use of *170 Colombia's name, petitioner made other substantial contributions to the operation of the plan. For an operation headquarters he allowed the group rent-free use of his office at 80 Wall Street. He contributed the services of his personal secretary to the venture and allowed the group to utilize his stationery for venture purposes. The stationery was headnoted "William Steno, Certified Public Accountant," a fictitious character entirely of petitioner's own creation. It was on such stationery that a completely false summary and financial statement of Colombia was filed by the group with Dun & Bradstreet, Inc., in August 1965. The financial statement purported to show Colombia as owning approximately $18 million of assets, when in reality the corporation at that time had no assets. In addition to the above-described contributions, petitioner also conducted at least one real estate appraisal for the group in connection with a request from a potential client for a mortgage commitment. Two other members of the group also performed significant roles in carrying out the mortgage commitment plan. Neiman and Crisona, as mentioned above, concocted the plan. Crisona, in addition, acted *171 as the group's attorney in its dealings with clients. Petitioner Neiman, and Crisona, all appear to have had a substantial voice in decision making, with no one individual seeming to have assumed any sort of supervisory role. In connection with its venture, the group collected fees in 1965 from numerous clients, including, at least, the following: Source
Amount Received Aleph Nursing Home
$13,540
Clinton Mall Corp.
8,500
Sydney Kline
2,500
Sunrise Mountain Corp.
30,000
Unknown
9,100
The $2,500 from Sydney Kline (Kline) was not paid as an advance, but rather for an appraisal petitioner performed for him on certain real estate. Kline did not seek a mortgage commitment from the group at that time. As to the $9,100 from an unknown source, in October 1965, Neiman opened an account with the Franklin National Bank (FNB) in New York in which he deposited a Chase check in the amount of $9,205.35. Two checks were written on the FNB account in the total amount of $9,100, but Chase subsequently refused to honor the check originally deposited in the FNB account. The group repaid the $9,100 to FNB, and petitioner has failed to show that such $9,100 was not *172 repaid from fees received from clients other than the ones listed above. Although the above-listed fees were received by the group, no mortgages were ever procured for any of the group's clients. After an advance or appraisal fee was received by the group and deposited in Colombia's account at Chase, Neiman and Anthony would withdraw the full amount of such fee and divide it equally between themselves. Crisona would then look to Neiman for some share of the proceeds Neiman had received, and petitioner would look for payment to Anthony. The record does not establish the amount, if any, that Anthony retained after settling accounts with petitioner from the 50 percent of each fee which he received. An exception to the above-described procedure occurred in the handling of the $30,000 fee from Sunrise. Of such fee, $7,500 was paid directly to Crisona, and $500 to a Richard Crake, before any actual split-up of funds between Anthony and Neiman. On December 19, 1968, because of their activities in promoting the venture, petitioner and the other members of the group were found guilty by a jury in the United States District Court for the Southern District of New York of engaging *173 in a scheme to defraud certain individuals and corporations, including clients of the group mentioned above. The indictment and verdict in petitioner's case included numerous individual counts of fraud, as well as one count of conspiracy. Petitioner was sentenced to three years in a federal camp, and in fact served two and one-half years in the Allenwood Federal Prison Camp. In his statutory notice of deficiency, respondent determined that the following fees in their full amount were income to petitioner in 1965: Aleph Nursing Home
$13,540.00
Clinton Mall Corp.
8,500.00
Sydney Kline (appraisal fee)
2,500.00
Unknown source (Chase check)
9,200.00
Sunrise Mountain Corp.
30,000.00
He further determined that a fee of $10,000 from William Sikora to the group was also fully includable by petitioner. At the trial, respondent conceded that petitioner had received no income from the Sikora fee. On brief he further conceded that $8,000 of the Sunrise fee was also not income to petitioner, having been directly received by Crisona and Crake. OPINION In 1965, petitioner and four other persons agreed to join efforts in a plan to offer mortgage commitments to *174 third parties. Acting through a corporation petitioner had previously organized - Colombia - the group would require an advance fee from the client in return for the group's promise to procure mortgage for the client by a certain date in the future. The group received fees from numerous clients, but the promised mortgages were never obtained. Four of such advance fees are the subject of the instant case: $13,540 received from Aleph Nursing Home; $8,500 received from Clinton Mall Corporation; $30,000 from Sunrise Mountain Corporation, and $9,200 received from an undisclosed source. [1] Respondent has determined that, except for $8,000 of the sum received from the Sunrise Mountain Corporation, all the above amounts are fully includable as income to petitioner. Furthermore, he determined that a $2,500 appraisal fee received by the group from Sydney Kline is also fully includable by petitioner. Except in certain special situations, none of which is here before us, respondent's statutory notice of deficiency is entitled to a presumption of correctness which it is petitioner's burden to overcome. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice *175 and Procedure. In the instant case, we think it clear that petitioner has overcome such burden in part, and that only $27,820 of the fees under consideration are properly chargeable to him. As indicated in our findings, Neiman and Anthony divided between themselves on a 50-50 basis, the fees received from clients of the group. Neiman's one-half of the proceeds would then be divided, in turn, between Neiman and Crisona. As to such one-half of the proceeds, we can see no reason for attributing this amount, received by Neiman and Crisona, to petitioner, and hence find that petitioner need not include this part of the group's proceeds in his income for 1965. As to the one-half of the proceeds which petitioner's brother received, petitioner introduced no evidence indicating how much of such funds were actually retained by his brother, as opposed to being turned over *176 to petitioner. As we found above, petitioner made substantial contributions to the group's venture. The venture operated through a company petitioner had organized. Petitioner provided the group with office space, a secretary, and stationery, with the fictitious "William Steno CPA" designation thereon. He also performed at least one real estate appraisal for the group. We have no similar indications as to Anthony's role, nor as to the roles played by Parks and Graber. On the basis of such lack of evidence as to any substantial role performed by Anthony - beyond participation in the initial division of fees with Neiman - we find ourselves simply unable to make any kind of allocation between Anthony and petitioner as to the one-half of the fees which Anthony received. Petitioner having failed to show what part of such $27,820 he did not receive, we uphold respondent's determination to the extent that it requires petitioner to include such amount in his income for the 1965 taxable year. Respondent urges us to disregard the existence of Colombia, and attribute all Colombia's receipts to petitioner as if it were his sole proprietorship. Suffice it to say that, on the facts before *177 us, a characterization of Colombia, for tax purposes, as an unincorporated sole proprietorship of petitioner, with Neiman and the others as petitioner's employees, would be totally unwarranted. Even were we to enter into a discussion of the reality of Colombia's existence, the most respondent could hope for would be a holding that Colombia was a de facto partnership. An analysis of petitioner's distributive share of such partnership proceeds would have been identical in all material respects to that we have arrived at above. Regarding the additions to tax under sections 6651(a), 6653(a), and 6654, petitioner has presented no evidence to overcome the presumptive correctness of respondent's determinations as to such matters. Accordingly, we hold that petitioner is liable for the penalties imposed by such sections of the Code. Decision will be entered under Rule 155. Footnotes
1. As we found above, two checks in the total amount of $9,100 were written against the Chase check deposited at FNB. The record shows that the group repaid only the amount of the two checks, and thus, we see no reason to require petitioner to explain his rights to any more than $9,100 from unknown sources. ↩